UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.: 18-31722 (AMN) |
| | : | Chapter 7 |
| SERVICOM LLC, | : | Jointly Administered with Case Nos. |
| JNET COMMUNICATIONS LLC, | : | 18-31723 (AMN) |
| and VITEL COMMUNICATIONS LLC | : | 18-31724 (AMN) |
| *Debtors* | : | |
| | : | |
| | : | |
| BARBARA KATZ, | : | |
| CHAPTER 7 TRUSTEE FOR | : | |
| VITEL LLC | : | Adv. Pro. No. 20-03035 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| MERCHANT AUTOMOTIVE GROUP, | : | |
| INC. *d/b/a* MERCHANTS LEASING | : | |
| *Defendant* | : | |
| | : | Re:  AP-ECF No. 6 |

**MEMORANDUM OF DECISION AFTER TRIAL
REGARDING CHAPTER 7 TRUSTEE'S PREFERENCE CLAIM
AND DEFENDANT'S NEW VALUE DEFENSE PURSUANT TO 11 U.S.C. § 547(c)(4)**

*Appearances*

| | |
|---|---|
| Robert M. Fleischer | *Counsel for plaintiff* |
| Matthew A. Pesce | |
| Green & Sklarz LLC | |
| One Audubon Street, Third Floor | |
| New Haven, CT 06511 | |
| | |
| Aaron B. Chapin (admitted *pro hac vice*) | *Counsel for defendant* |
| Husch Blackwell LLP | |
| 120 South Riverside Plaza, Suite 2200 | |
| Chicago, IL 60606 | |
| | |
| Iana A. Vladimirova (admitted *pro hac vice*) | *Counsel for defendant* |
| Husch Blackwell LLP | |
| 33 East Main Street, Suite 300 | |
| Madison, WI 53703 | |

Evan S. Goldstein                                                    *Local Counsel for defendant*
Updike, Kelly & Spellacy, P.C.
100 Pearl Street, 17th Floor
P.O. Box 231277
Hartford, CT 06123-1277

_____

## I.    INTRODUCTION

Before the court is a two-count complaint by plaintiff Barbara Katz, Chapter 7

Trustee ("Trustee" or "plaintiff"), seeking to avoid preferential payments made by Vitel

Communications LLC ("Vitel" or "Debtor") to Merchants Automotive Group, Inc., d/b/a/

Merchants Leasing (the "defendant" or "Merchants"), pursuant to 11 U.S.C. § 547(b).[1]

The defendant primarily argues it provided the Debtor with new value, thus defeating

any preference claim pursuant to Bankruptcy Code § 547(c)(4).  The defendant also

disputes whether the Trustee engaged in reasonable due diligence as to any possible

affirmative defenses it might have before filing the complaint, as required by Bankruptcy

Code § 547(b).

One question raised by the largely uncontested facts is whether continued

possession of leased property – here a fleet of motor vehicles including service trucks

– may be construed as "new value" under Bankruptcy Code § 547(c)(4).  The Trustee

allows that use of a particular vehicle might be considered new value, but urges a case

by case analysis, requiring the defendant to prove actual use of each vehicle, with new

value limited to a *per diem* allowance for the days each vehicle was used.

The defendant counters that use of some vehicles combined with the possession

and availability of the balance of the leased fleet constitutes new value and a simple *per*

_____

[1]      The Bankruptcy Code is found at Title 11, United States Code. Unless otherwise stated, statutory references are to the Bankruptcy Code.

*diem* charge equal to the invoiced amounts for the entire fleet should be employed to calculate "new value." Merchants argues the court should rely in part on Vitel's own statements about its pre-petition activity made during the early days of its bankruptcy case – when it was a Chapter 11 debtor pursuing reorganization and before conversion to the present Chapter 7 case -- to support a conclusion that use of some vehicles and the possibility of use of more vehicles was valuable to the Debtor's business pre-petition.

Because the record here supports the conclusion that the Debtor's possession and use of the fleet of vehicles provided new value after each of the preferential payments or transfers to the vehicle lessor, the preference claim largely fails. Because there is a small sum that was transferred to the defendant to which new value does not apply, judgment in favor of the plaintiff will enter to the extent of that small sum.

As to the question of the Trustee's alleged lack of due diligence respecting the new value defense, for the reasons that follow that issue is not dispositive.

## II.   JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), and the United States District Court for the District of Connecticut's General Order of Reference dated September 21, 1984. This adversary proceeding is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F) (proceedings to determine, avoid or recover preferences). This adversary proceeding arises under the Debtor's Chapter 7 case pending in this District and venue is proper pursuant to 28 U.S.C. § 1409(a).

As necessary, this memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure,

applicable here pursuant to Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

### III.    RELEVANT PROCEDURAL HISTORY AND FINDINGS OF FACT

#### *The Debtor's Pre-Petition Business*

Prior to the underlying bankruptcy case here, Vitel provided installation and construction related services and other customer management services to cable and telecom companies, including installation of cable and telephone equipment, high speed data and digital phone installation, and multiple dwelling unit construction.  AP-ECF No. 117, p. 2, ¶ 8.[2]  Vitel's employees, including installers and technicians, traveled to offsite locations to perform their work using approximately 160 vehicles leased from Merchants.  AP-ECF No. 117, p. 8, ¶ 45.  The work performed by Vitel's installers and technicians was the primary source of its business revenue.  AP-ECF No. 117, p. 8, ¶ 46.  Vitel operated in various states including Georgia, Maryland, New Jersey, Ohio, and Texas, employing approximately 155 people in October 2018.  AP-ECF Nos. 117, p. 7, ¶ 40; 126, p. 26.  On October 13, 2018, Vitel terminated the employment of approximately 130 people, leaving approximately twenty-five (25) people employed on October 19, 2018, the date Vitel filed a voluntary Chapter 11 petition ("Petition Date").  AP-ECF No. 129-8, p.6, ¶ 14; 126, p. 27.[3]

---

[2]    Citations to the docket of the underlying Chapter 7 bankruptcy (jointly administered) case, Case No. 18-31722, are noted by "ECF No."  Citations to the docket of this adversary proceeding, Case No. 20-03035 are noted by "AP-ECF No."  Vitel's Chapter 7 bankruptcy case, Case No. 18-31724, was jointly administered under Case No. 18-31722.  To the extent this Decision cites to docket entries of Vitel's Chapter 7 bankruptcy case, such entries will specify the case number.

[3]    *See also,* ECF No. 7, ¶ 9, 14 (Motion for Authority to Pay Pre-Petition Employee Wages, Salaries, and Related Items; To Pay Health Insurance Benefits and Related Benefits; to Reimburse Pre-Petition Employee Business Expenses and to Make Payments for which Payroll Deductions Were Made, filed in the Main Case on the Petition Date):

At all relevant times Merchants was in the business of leasing fleets of vehicles to businesses like Vitel, and funding certain vehicle charges (*i.e.,* paying parking, moving and toll violations) and services (*i.e.,* maintaining, replacing and renewing vehicle registrations). *See,* AP-ECF No. 129-2, pp. 9-10.   In 2017, Merchants and Vitel entered into an Open-End Master Lease Agreement (the "Agreement") for a fleet of vehicles Vitel would use to run its operations.   AP-ECF Nos. 117, p. 2; 129-2.   Pursuant to the Agreement, and beginning before the preference period (*i.e.,* prior to ninety (90) days before the Petition Date), Merchants leased a fleet of not less than 159 vehicles (the "Fleet") to Vitel.   AP-ECF Nos. 117, 126, p. 123, L. 3.   In exchange for use of the Fleet, Vitel owed Merchants a monthly rental charge for each vehicle (the "base charges").   AP-ECF Nos. 117, ¶¶ 25-27; 129-2, ¶ 7.   Part of the deal was that Merchants paid charges incurred by the leased vehicles, including highway toll violation charges, registration renewal charges and the like, and Vitel later reimbursed Merchants.   AP-ECF No. 117, p. 5, ¶¶ 28-29.   Merchants sent Vitel periodic monthly invoices for the base charges for the upcoming month, including any fees or charges paid by Merchants for Vitel's benefit

---

9.   As for Vitel, the overall shrinking of the residential cable industry significantly decreased revenue. In particular, starting in late 2017, one cable company reduced the amount of fulfillment work assigned to subcontractors like Vitel by 40%. This had a significant adverse impact on cash flow. In response, Vitel took the necessary steps in 2018 to right size its operations in light of these changes only to see a further dip in revenue awarded. The 2018 construction work from new contracts was also delayed from Q2 to Q3, compounding the overall losses suffered.

14.   Vitel's employees are also paid bi-weekly, one week in arrears…, such that its last payroll funding on October 12, 2018, paid employees for the period of September 23, 2018 through October 6, 2018. Approximately 130 Vitel employees were not paid on October 12, 2018, and Vitel terminated those employees on or about October 13, 2018. These terminated employees are entitled to compensation on Vitel's next payroll funding date for the period of October 7, 2018 through October 13, 2018.

15.   As of the Petition Date, the Debtors' employees, and with respect to Vitel its former employees, were owed or had accrued various sums for (i) wages, salaries, commissions, sick pay, vacation obligations (including "personal days") and holiday pay, (ii) employee health benefits, (iii) other employee-related benefits and (iv) reimbursement of employee business expenses (including travel and lodging) (collectively, the "Pre-Petition Compensation").

during the previous month.  AP-ECF No. 117, p. 4.

The parties' Agreement contemplated several possible dispositions for one or more of the leased vehicles.  For any vehicles that had been in service for at least the minimum lease term of three hundred sixty-seven (367) days, Vitel could terminate the Agreement early (or before the maximum lease term of sixty (60) months) as to one or more vehicles upon thirty (30) days written notice.  AP-ECF No. 126, pp. 106-107, 129-2, ¶¶ 10, 24.  The Agreement specified a formula for determining the parties' financial adjustments regarding vehicles that were terminated early, including adjustments for a yield maintenance fee,  and an interest equalization adjustment.  AP-ECF No. 129-4, ¶ 24.

In a section titled "SURRENDER OF VEHICLES," the Agreement provided that Vitel could deliver possession of a vehicle or vehicles to Merchants upon ten (10) days written notice at the end of the "minimum Lease Term, or at any time thereafter."  AP-ECF No. 129-2, ¶ 9.  If a vehicle was returned to Merchants at the conclusion of the minimum lease term or later under the surrender provisions, the Agreement specified a process for a transfer or sale to either Merchants or a third party, depreciation, and account adjustment.  AP-ECF No. 129-2, ¶¶ 9-11.

In addition, the Agreement contemplated Vitel might default through non-payment or otherwise, and, provided Merchants with remedies including repossession of all leased vehicles.  AP-ECF Nos. 117, ¶ 35, 129-2, ¶17(b).

Here, the ninety (90) day period relevant to a preference analysis under the Bankruptcy Code began on July 20, 2018 and ended on October 19, 2018 (the "Preference Period").  AP-ECF No. 117, p. 3, ¶ 13.  At the beginning of the Preference

Period, Vitel was significantly past due on its lease payments to Merchants.  AP-ECF No. 117, p. 3.

While the parties stipulated Vitel "never requested that the Agreement be terminated and that Merchants accept return of the vehicles," they fail to explain what happened to the Fleet[4] at any time after the Petition Date.  AP-ECF No. 117, p. 7, ¶ 36. While there was no clear evidence about what happened to the vehicles singularly or in the aggregate, it appears such a transfer of possession – or relinquishment of possession – did not take place before the Petition Date.

### The Preferential Transfers

During the Preference Period, the Debtor made five (5) payments to the defendant on the dates and in the amounts (the "Transfers") reflected in the following chart:

| Payment Date | Transfer Amount |
|---|---|
| 8/3/2018 | $59,000.00 |
| 8/31/2018 | $25,000.00 |
| 9/14/2018 | $11,156.30 |
| 9/14/2018 | $38,843.70 |
| 10/9/2018 | $25,000.00 |

AP-ECF No. 117, p. 3.

Notwithstanding these payments, Vitel remained delinquent under the Agreement continuously during the Preference Period.  AP-ECF Nos. 117, p. 3; 126, p. 61.  The Debtor made each Transfer at a time when it was past due on its obligations and none of the Transfers cured the past due amounts.  AP-ECF No. 117, p. 3.

### The Possible New Value

The parties agree Vitel had possession of the Fleet during the entire Preference Period.  AP-ECF No. 117, p. 3, ¶ 14.  Merchants asserts that after each of Vitel's

---

[4]     The court notes in the parties' Stipulation of Facts, the parties stipulate to this fact using the term "vehicles." *See* AP-ECF No. 117, p. 3.  The court uses this term synonymously with "Fleet."

Transfers, it provided new value to the Debtor as calculated by the base charges and other charges – including toll charges – as shown in the invoices dated July 12, 2018, August 12, 2018, and September 11, 2018 (the "July Invoice," "August Invoice," and "September Invoice," respectively). AP-ECF Nos. 129-3, 129-4, 129-5. Each invoice provided the base charges owed by Vitel for the upcoming month. The base charges and a *per diem* based upon the base charges only and the number of days in each month is reflected in the following chart:

| Invoice | Applicable Lease Month | Total Base Charges | Days Per Month | *Per Diem* of Base Charges only |
|---|---|---|---|---|
| July Invoice | August | $76,102.92 | 31 | $2,454.93 (August base charge *per diem*) |
| August Invoice | September | $76,102.92 | 30 | $2,536.74 (September base charge *per diem*) |
| September Invoice | October | $66,708.87 | 31 | $2,151.90 (October base charge *per diem*) |

AP-ECF Nos. 129-3, 129-4, 129-5.

Merchants offered a toll report showing payments made on behalf of certain vehicles. AP-ECF No. 129-14. The toll report purports to show some, but not all, of the vehicles were in use during the Preference Period by the incurrence of toll charges on certain days. AP-ECF No. 126, p.140, L. 20. Merchants argues its preference exposure – after considering the new value it provided – would be at most, $1,329.10. AP-ECF No. 135, p. 11; AP-ECF No. 129-13.

### *Debtor's Intent to Retain Possession*

Vitel and Merchants were in regular communication via email regarding the arrearage. AP-ECF No. 129-11. Shortly before the start of the Preference Period, Vitel's controller represented to Merchants an anticipated increase in work in July of 2018.

Very simply, we have entered into two new customer contracts for Vitel's

construction business. This work will be very profitable for us, but there have been many upfront costs associated with getting the business outfitted (*i.e.,* Relocation of new hires, offices, equipment, etc.). Naturally, this has been a bit of a drain on our cash flow. We expected the work to begin sooner than July, so we did not anticipate falling behind as we have. That being said, we now have confirmation that work will begin in July.

*Email dated July 3, 2018, from Pam Dimitro, controller of Vitel, to Nicole Spaulding, Merchant's Assistant Director of Financial Operations.*
AP-ECF No. 129-11, p. 12.

During the Preference Period, on July 31, 2018, the Debtor proposed a modified payment plan of $50,000 per week beginning the following week in an effort to address the continuing balance due.  AP-ECF No. 117, p. 7.  Merchants agreed.  AP-ECF No. 117, p. 7.  Less than a month later, on August 17, 2018, the Debtor again proposed a modified payment plan, reducing the previously agreed $50,000 per week to $25,000 per week starting on the week ending September 7, 2018.  AP-ECF No. 117, p. 7.  Merchants again agreed.  AP-ECF No. 117, p. 7.

We are currently in the process of ramping up a significant amount of construction work for Vitel in TX and OH.  This will be highly profitable to us and we are very excited to be awarded this work. … However, please know that our relationship with Merchants is extremely important to us and getting you paid is a priority. Therefore, in the short-term, we are proposing $25K per week starting the week ending 9/7. I know this is a small amount given what we owe, but we definitely want to get cash flowing in your direction. As our new business starts generating cash flow (which will be in September), we will assess the amount we are sending and increase as soon as possible. As we approach November and December, we expect to see much improvement in our cash and thereby able to pick up the pace. Thank you so much for your tremendous partnership and your willingness to work with us.

*Email dated August 17, 2018, from Pam Dimitro, controller of Vitel, to Nicole Spaulding, Merchant's Assistant Director of Financial Operations.*
AP-ECF No. 129-11, p. 10.

Four days after this email, Vitel and Merchants reaffirmed the payment terms for September and October 2018.

I too value this relationship but changes with our Comcast business and the

slow ramp in Construction has place us in this very difficult position. These changes almost took us down. I will call to provide my thoughts on how we will proceed. As in the past, we will get caught up.
*Email dated August 21, 2018, from Gene Caldwell, Vitel's Chief Financial Officers, to Robert Singer, President of Merchants.*
AP-ECF No. 129-11, p. 32.

I have spoken with Gene and let's move forward with this plan. First $25K should be next week. Hopefully in October goes up to $50K a week. Gene has given me good reason to believe the worst is behind them and better days are ahead.
*Email dated August 21, 2018, from Robert Singer, President of Merchants to Nicole Spaulding, Merchant's Assistant Director of Financial Operations and Merchant's Credit Committee.*
AP-ECF No. 129-11, p. 47.

Prior to October 14, 2018, Vitel was telling Merchants the Fleet was necessary for

Vitel's continued operations.

Q:    So prior to these two letters and your conversations with Gene on October 14, did you have any indication that Vitel was going to terminate a [sic] construction and installation work?

A:    No, not at all.  No, no, it was always -- no, I had – I did not have any knowledge prior to that date that they were getting rid -- getting out of that business.

Q:    In your conversation with Gene prior to October 14th did he ever mention that they were trying to decrease their construction and installation work?

A:    No, he definitely assured me that he needed the vehicles for both the installation of the cable boxes as well as the construction. I mean, that was something that he had said to me on many occasions, you know, that he needed the vehicles to do their work.
Testimony of Robert Singer, President of Merchants. AP-ECF No. 126, p. 92, L. 24-25, p. 93, L. 1-15.

However, by October 14, 2018, it was clear Vitel's installation business was

finished although Vitel hoped to assign vehicles to a new provider.

Gene Caldwell, CFO, called me Friday afternoon. They have given COMCAST notice to stop with their installation business immediately. Their focus will be on them SERVICOM business, their call center, and

construction business related to telecom. They were giving their employees notice Friday afternoon and Gene was calling me on Monday to see what possibilities are available for their fleet of 160 units. hoping that assignment to new provider was a possibility.

*Email dated October 14, 2018, from Robert Singer, President of Merchants to Nicole Spaulding, Assistant Director of Financial Operations and Merchant's Credit Committee.*

AP-ECF No. 129-11, p. 64.

Vitel's post-petition statements during the early phase of its Chapter 11 case provide further evidence that Vitel continued to operate – and use the Fleet – during the Preference Period.[5]

- Vitel's Statement of Financial Affairs reflects gross revenue of approximately $15,324,000 from January 1, 2018 to the Petition Date (October 19, 2018).  Case No. 18-31724, ECF No. 24, p. 90.  There is no evidence providing more specificity as to when in the year 2018 Vitel generated this gross revenue.

- Vitel's Monthly Operating Report for the period October 20, 2018 through and including October 31, 2018 filed in the Main Case reports reflects approximately $2,696,000 of accounts receivable at the beginning of the reporting period and $713,014.28 of collections during this eleven (11) day period.  AP-ECF No. 129-6, p. 21.  This Report also indicated approximately $1,988,000 of the accounts receivable were 0-30 days old.  *Id.*

- Vitel represented to the court in connection with a request to use cash collateral that it had, "in October of 2018 (prior to the Petition Date), ceased operating and wound down [its residential broadband installation]

---

[5] The court takes judicial notice pursuant to Fed.R.Evid. 201 of the docket and filings in the underlying Chapter 7 bankruptcy (jointly administered) case, Case No. 18-31722, and of the docket and filings in Vitel's Chapter 7 bankruptcy case, Case No. 18-31724.

business", and, that "Vitel Installers are creditors of Vitel having not been paid for some of the services they performed for Vitel prior to the Petition Date." ECF No. 152, p. 8. While statements made in motions by Vitel's counsel are not evidence, no evidence in the record contradicts the suggestion Vitel terminated at least 130 employees and ceased operating at some point in October of 2018, and as of the Petition Date had 25 employees.

Despite expressing an intention to cure its debt and escalate its business, the Debtor failed to pay Merchants and subsequently filed bankruptcy. Case No. 18-31724, ECF No. 1.

### *Debtor's Bankruptcy Case*

On the Petition Date, Vitel and two related companies – ServiCom LLC ("ServiCom") and JNET Communications LLC ("JNET") – filed voluntary Chapter 11 petitions that were jointly administered under case number 18-31722 ("Main Case"). *See* Case Nos. 18-31722 (ECF No. 11), 18-31723, 18-31724. The cases were converted to cases under Chapter 7 of the Bankruptcy Code in early 2019, and the Trustee was appointed for the jointly administered cases. ECF No. 394. This adversary proceeding concerns only the Debtor Vitel.

In its bankruptcy case, Vitel scheduled an undisputed, unsecured, non-priority debt to "Merchants Leasing" in the amount of $518,419.59. AP-ECF Nos. 117, p.4, ¶19; 129-1, p. 76. As of the Petition Date, Vitel had not paid all amounts due under the Agreement. AP-ECF No. 117, p. 3, ¶ 15. The defendant did not file a proof of claim against Vitel in its bankruptcy case. AP-ECF No. 117, p. 4., ¶ 23.

***Trustee's Adversary Proceeding***

On June 22, 2020, the Trustee commenced this adversary proceeding by filing a two count complaint[6] (the "Complaint") against Merchants seeking to avoid preferential transfers made by Vitel to Merchants during the Preference Period pursuant to Bankruptcy Code §§ 547(b), 550, and 551 ("Count One") and claim disallowance under Bankruptcy Code § 502(d) ("Count Two").  AP-ECF Nos. 1; 6.

Prior to initiating this adversary proceeding case, the plaintiff employed professionals including an accountant and counsel to assist in analyzing the viability of any preferential transfer claims.  AP-ECF No. 126, p. 15, L. 17.  The plaintiff and the professionals, after review of the Debtor's documents, determined a preferential transfer claim existed.  AP-ECF No. 126, p. 17, L. 1.  The plaintiff testified her analysis accounted for potential affirmative defenses.  AP-ECF No. 126, p. 18, L. 14.  The Trustee was unfamiliar with the initial motions filed in the Chapter 11 case, testifying she reviewed only the resulting orders authorizing payment of certain prepetition wage claims to the three debtors' employees including employees of Vitel, and the cash collateral orders.  She testified she did not review the underlying motions to pay employees and to use cash collateral.

Merchants filed a Motion for Summary Judgment, asserting a new value defense pursuant to Bankruptcy Code § 547(c)(4).  AP-ECF No. 22.  The defendant argued it provided new value through Vitel's continued possession and use of its vehicles, and introduced facts in the form of invoices, an affidavit, and a toll report.  AP-ECF Nos. 80, 81.  The defendant alleged the invoices demonstrated certain vehicles were in use during

---

[6]    An amended complaint was filed by the plaintiff on June 26, 2020 to correct the name of the defendant.  AP-ECF No. 6.  References to the "complaint" mean the amended and operative complaint.

the relevant time because the vehicles incurred various "Toll Charges," "License Management" charges, and other charges. AP-ECF No. 83.

The Trustee argued mere possession of leased vehicles does not constitute new value, and since the Debtor did not make use of the entire Fleet, the defendant gave no new value to the Debtor. AP-ECF Nos. 80, 81. The plaintiff admitted the Debtor used approximately fourteen of the leased vehicles during the Preference Period but argued this was insufficient to show use of the entire Fleet. AP-ECF No. 86, p. 4. Ultimately, the court denied the defendant's motion for summary judgment and scheduled a trial. AP-ECF Nos. 94, 98.

On June 27, 2022, a trial was held after the parties stipulated to a number of facts. AP-ECF Nos. 117, 119, 126. During the trial, the plaintiff Barbara Katz, Chapter 7 Trustee testified. AP-ECF Nos. 114, 119, 126. The defendant called Brian Smith, a credit manager of Merchants during the relevant period, and Robert Singer, president of Merchants, as witnesses. AP-ECF Nos. 102, 119, 126. Both parties introduced exhibits.[7]

The defendant argued the Debtor used the Fleet as demonstrated by the toll reports and the payroll records attached to the Debtors' Motion To Pay Prepetition Wages in the Main Case showing Vitel had approximately 155 employees immediately prior to the Petition Date and during the Preference Period. AP-ECF No. 117, ¶ 40; 129-8. Additionally, the defendant relied upon Vitel's representations in its monthly operating report that it generated receivables through the operation of its business in the 30 days prior to the Petition Date that were collected during the period between October 20, 2018 and October 31, 2018 in the amount of $713,014.28. AP-ECF No. 117, ¶¶ 43–46; 129-

---

[7]     Trial exhibits and witnesses are listed as AP-ECF No. 129. This decision cites to trial exhibits as they are found in AP-ECF No. 129.

6, p. 21.  Moreover, based on the Debtors' Motion For Authority To Use Cash Collateral, Vitel factored its accounts receivable to Coral Capital under a contract pursuant to which the Debtors were paid 85% of the face amount of factored receivables and the remaining 15%, less factoring fees, (the "Back End Payment") when an account was collected by Coral Capital, and per Vitel's schedules, the total of Back End Payments due Vitel as of the Petition Date was $399,863.00.  AP-ECF No. 117, ¶ 41–42; 129-1; 129-7.

After trial, the Chapter 7 Trustee filed a Motion for Order Authorizing Rule 2004 Examination of Merchant's Automotive Group, Inc. in the Main Case claiming she required more facts regarding the relationship between Vitel and Merchants.  ECF No. 1520.  The Trustee asserted the Agreement contained a "Terminal Rental Adjustment" clause, wherein the parties agreed to an enhancement or reduction in the value of vehicles returned by the Debtor to the defendant such that, upon return of said vehicles, "[i]f the Net Proceeds exceed the Book Value (as defined in the Rate Schedule) of the Vehicle, [defendant] shall retain an amount equal to the Book Value and remit or credit the excess to [Debtor] as a refund of rental."  *Id.*  The Trustee claimed Merchants failed to provide the Debtor Vitel or the Trustee with information concerning the terminal rental adjustment for any of vehicles returned to the defendant after the commencement of the Debtor's bankruptcy case.  *Id.*  It remains unclear how or when the vehicles were turned over.  The following exchange is consistent with the evidence at trial in that no explanation for the fate of the Fleet has been provided to the court.

> Court: [H]ow were the vehicles turned over from the Debtor to [the defendant] after the petition date?
> Attorney Fleisher: I don't know that answer to that question.
> Court: Do you know the answer to that question, Attorney Chapin?
> Attorney Chapin: I do not know the answer to that question.

Hearing on September 7, 2022,  Main Case, ECF No. 1588 at 00:09:40-00:09:58.[8]

On February 15, 2023, the Trustee filed a second complaint against Merchants. Adversary Proceeding, Case No. 23-03001.[9]

## IV.   APPLICABLE LAW

### *Preferential Transfers*

The framework used to evaluate a bankruptcy preference is well defined.  Section 547 of the Bankruptcy Code "permits bankruptcy estates to recover preferential transfers, or 'preferences,' made between the debtor and its creditors before the debtor files a bankruptcy petition."  *In re Ames Dep't Stores, Inc.*, 506 F. App'x 70, 72 (2d Cir. 2012)(summary order).  "In order to show an avoidable preference, the trustee has the burden of proving each element of § 547(b) by a preponderance of the evidence."  *In re Donghia, Inc.,* No. 20-30487, 2022 WL 2898781, at *3 (Bankr. D. Conn. July 21, 2022). To avoid pre-petition transfers pursuant to § 547(b), a trustee must, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), establish any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition; ... and
(5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and

---

[8]     The court reviewed the audio file of the hearings using VLC Media Player.  All citations to the audio file of a hearing are to the ECF number of the recording and then to the location of the cited audio as follows: AP-ECF No. ____ at hours:minutes:seconds.
[9]     The court notes that resolution of the current case does not, in and of itself, resolve the matters pending in Case No. 23-03001.

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Bankruptcy Code § 547(b).

Avoidance of preferential transfers performs the two functions of: (1) discouraging creditors "from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy"; and (2) "facilitat[ing] the prime bankruptcy policy of equality of distribution among creditors of the debtor." *In re Capasso*, 618 B.R. 389, 394 (Bankr. D. Conn. 2020) (*quoting Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (*quoting* H.R.Rep. No. 95-595, pp. 177–78, U.S. Code Cong. & Admin. News 1978, pp. 6137–38)).

### *New Value Defense*

The Bankruptcy Code seeks to balance the competing goals of equal distribution of assets among similarly situated creditors, and, encouragement of creditors to work with a delinquent lessee or borrower with the hope that the flailing business will be able work its way out of financial difficulty and avoid bankruptcy. *See* 5 *Collier on Bankruptcy,* (Richard Levin & Henry J. Sommer eds., 16th ed. 2023). If a trustee meets its burden to prove the elements of a preferential transfer pursuant to § 547(b), a defendant "may still prevail if it can establish a defense set forth under § 547(c)." *In re Save Home Energy, Inc.*, 567 B.R. 1, 12 (Bankr. D. Conn. 2017). Defenses to preferential transfers are designed "to rescue from attack in bankruptcy those kinds of transactions, otherwise fitting the definition of a preference, that are essential to commercial reality and do not offend the purposes of preference law, or that benefit the ongoing business by helping to keep the potential bankrupt afloat." *In re Boston Grand Prix, LLC*, No. 16-12574-MSH, 2018 WL 4030731, at *9 (Bankr. D. Mass. Aug. 21, 2018).

The only affirmative defense pursued by the defendant was subsequent new value,

under Bankruptcy Code § 547(c)(4).  Bankruptcy Code § 547(c)(4) provides, in relevant part, a "trustee may not avoid . . . a transfer to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." Bankruptcy Code § 547(c)(4).  "New value" is defined as "money or money's worth in goods, services, or new credit" and explicitly excludes "an obligation substituted for an existing obligation."   Bankruptcy Code § 547(a)(2).   "Forbearance from exercising preexisting rights does not constitute new value."  *In re ABC-Naco, Inc.,* 483 F.3d 470, 474 (7th Cir. 2007) (citations omitted).

"The 'new value' defense is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of the other creditors."  *In re Maxwell Newspapers, Inc.*, 192 B.R. 633, 635 (Bankr. S.D.N.Y. 1996).   The purpose of the new value exception is to encourage creditors to continue to do business with debtors by ensuring they will not have to disgorge payments received for value they provided the debtors.  *In re Bruno Machinery Corp.*, 435 B.R. 819, 847 (Bankr. N.D.N.Y. 2010).

Courts sometimes require the creditor to bear the burden to prove the nonavoidability of a transfer by showing: 1) the creditor extended new value to the debtor after receiving the preference payment; 2) the new value is unsecured; and 3) the new value remains unpaid. Bankruptcy Code § 547(g); *In re Bruno Machinery Corp.*, 435 B.R. at 847 (*citing In re Teligent, Inc.*, 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004)).   A split in authority exists as to whether new value must be unpaid as of the Petition Date and the Second Circuit has not spoken on this issue.  *See, Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178 (11th Cir. 2018) (joining Fourth, Fifth, Eighth,

and Ninth Circuits in applying a more expansive reading of Section 547(c)(4) that includes all new value supplied by the creditor during the preference period and not merely new value that remains unpaid on the petition date); *In re Prescott*, 805 F.2d 719, 731 (7th Cir. 1986) (new value must remain unpaid for Section 547(c)(4) defense to apply); *N.Y.C. Shoes Inc. v. Bentley Int'l Inc. (In re N.Y.C. Shoes Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989) (same). Here, the court follows the reasoning of the court in *Van Dyck/Columbia Printing v. Katz*, concluding § 547(c)(4) was not designed to limit credit for subsequent advances to advances that remained unpaid because such a result would limit § 547(c)(4) to one subsequent advance. *See*, *Van Dyck/Columbia Printing v. Katz*, 289 B.R. 304, 315 (D. Conn. 2003).

### New Value in a Lease Context

Courts are divided on the appropriate analysis of "new value" when a defendant alleges to provide new value in the form of leased goods or services. Because "new value," may not be in the form of an obligation substituted for an existing obligation, the creditor must provide additional benefit beyond the forbearance from exercising its right to repossess a leased good or terminate a leased service. Bankruptcy Code § 547(c)(2); *In re Maxwell Newspapers, Inc.*, 192 B.R. 633, 637 (Bankr. S.D.N.Y. 1996) ("forbearance from exercising pre-existing rights does not constitute new value under § 547(a)(2)"). Courts have found an additional benefit when there is evidence of separate consideration, use or nonuse, the ability to replenish the estate, or the intent of the debtor.

In *In re Discovery Zone*, the court concluded payments for the continued use of a trademark license agreement constituted new value by defining "new value" as "any consideration sufficient to support a contract." *In re Discovery Zone, Inc.*, 300 B.R. 856, 860 (Bankr. D. Del. 2003) (*citing Ross v. Phila. Housing Auth. (In re Ross)*, No. 97-0063,

1997 WL 331830 (Bankr.E.D.Pa. June 10, 1997)).

The Eighth Circuit held a debtor's continued use of leased real property may constitute new value. *S. Tech. Coll., Inc. v. Hood*, 89 F.3d 1381, 1384 (8th Cir.1996). Because the debtor in *S. Tech. Coll.* used the leased property for two rent-free months, the lessor had conferred a benefit and, thus, new value to the debtor. *S. Tech. Coll., Inc.*, 89 F.3d at 1384. Using similar reasoning but relying on facts suggesting the debtor abandoned leased real property nineteen (19) months prior to the bankruptcy petition, the Eleventh Circuit held there was no new value provided when a debtor did not use leased real property during the preference period. *In re Jet Florida System, Inc.*, 841 F.2d 1082, 1084 (11th Cir.1988).

New value has also been determined based on the potential to replenish the estate. In *In re Duffy*, a creditor was not able to establish it provided new value because the debtor's continued use of a leased personal vehicle did not have the potential to replenish the estate but instead served only to deplete the estate. *In re Duffy*, 3 B.R. 263, 266 (Bankr. S.D.N.Y. 1980).

Other courts have found the actual use of the leased property or replenishment of the estate are not essential elements for finding new value. In *In re Omniplex Communications Group, L.L.C.*, the debtor's opportunity and intention to use leased equipment was determined to have provided a material benefit to the debtor sufficient to find new value despite the debtor's lack of actual use. *In re Omniplex Commc'ns Grp., L.L.C.*, 297 B.R. 573, 577 (Bankr. E.D. Mo. 2003).

A factually similar case assessing whether a continued supply of leased vehicles constitutes new value involved a Chapter 11 debtor whose business entailed serving as

an intermediate lessor-lessee of motor vehicles between manufacturers and auto rental companies. *In re Lease-A-Fleet, Inc.*, 141 B.R. 853 (Bankr. E.D. Pa. 1992). There, the debtor entered into an annual agreement with the defendant that provided the defendant would lease designated vehicles to the debtor in exchange for a monthly rental fee. *In re Lease-A-Fleet, Inc.*, 140 B.R. at 841. The defendant continued to lease vehicles to the debtor both in the 90-day period prior to the debtor's bankruptcy filing and post-filing of the petition. *In re Lease-A-Fleet, Inc.*, 141 B.R. at 864. The bankruptcy court held because the defendant's "continuing supply of vehicles to the Debtor was absolutely crucial to the Debtor's continued operations," the continued lease constituted new value. *In re Lease-A-Fleet, Inc.*, 141 B.R. at 864.

In a somewhat similar vein, a bankruptcy court noted that when a lessee pays to repair leased vehicles damaged by the debtor under a contract obligating the debtor to fix any damage, the lessee provides new value to the debtor. *In re A-1 Express Delivery Serv., Inc.*, 17-52865-PMB, 2020 WL 5883427, at *4 (Bankr. N.D. Ga. Oct. 1, 2020).

> The Trustee asserts that the Debtor did not get "value" for these charges because the repair would only benefit the Defendant, and thus they do not constitute "new value" for the purposes of 11 U.S.C. § 547(c)(4). The Trustee, however, asks the wrong question. The question is not whether the Debtor was directly benefitted by the repair of the damaged leased vehicle. Instead, the question is whether by incurring the cost to fix the vehicle, which the Debtor was obligated to fix, rather than making the Debtor pay it immediately, the Defendant extended "money's worth" in "new credit" to the Debtor. 11 U.S.C. § 547(c)(4) requires that the Debtor get "new value", which per 11 U.S.C. § 547(a)(2) is "money or money's worth in goods, services or new credit." Here the Debtor was obligated to the Defendant pursuant to the Agreements for the cost to fix any damage to the vehicles leased from the Defendant, net of contractually required insurance. These obligations provided "money's worth", or value, to the Debtor because, like the lease payments that the Trustee concedes are new value, they were part of the consideration required by the Defendant under the Agreements for the Debtor's continued use of the vehicles. Like the lease payments, they were an extension of credit that permitted the Debtor to use the leased vehicles.

The Debtor was benefitted because it could continue to use the leased vehicles, and because the Defendant did not require it to pay these charges immediately, but permitted it to pay them on credit, leaving the Debtor's funds on hand available for other Debtor purposes.

*In re A-1 Express Delivery Serv., Inc.*, 2020 WL 5883427, at *4.

## V.   DISCUSSION

### *The Transfers Were Preferential*

Merchants conceded the Trustee satisfied the elements required to establish a preferential transfer pursuant to Bankruptcy Code §§ 547(b)(1) – (4).  AP-ECF No. 135, p. 16, footnote 5.  As to § 547(b)(5), Vitel's bankruptcy schedules identify assets totaling approximately $835,000 and liabilities totaling approximately $15,750,000.  AP-ECF No. 129-1.  The defendant's argument that the Trustee failed to establish the Transfers enabled Merchants to receive more than it would have in an eventual distribution in the Chapter 7 case is easily rejected on this record.  *See, In re: Lease-a-Fleet, Inc.*, 141 B.R. at 861.  The Trustee established the Transfers were preferential by a preponderance of the evidence.

### *Whether the Trustee Failed to Perform Reasonable Diligence Before Filing the Complaint is Not Dispositive*

Merchants argues the Trustee did not provide sufficient evidence to conclude she performed reasonable due diligence before initiating this adversary by considering any available affirmative defenses Merchants might have.  But the Trustee testified that she consulted with her retained professionals including an accountant and lawyers before filing the initial Complaint.

Here, the parties essentially agree the transfers made during the Preference Period were, in fact, preferential.  They argue about the application of existing caselaw to this case because the conclusion that continued possession of leased property after a

preferential payment may constitute new value in every case is not clear, and there is no case squarely on point with this one within the Second Circuit.

With this backdrop, the court declines to reach the conclusion the due diligence by the Trustee, such as it was, was unreasonable. The court need not decide whether the relatively new due diligence provision of § 547(b) is a separate element that may be dispositive of an otherwise established preference claim. Here, the court is unpersuaded there was a lack of reasonable due diligence.

### What is "subsequent new value" vis-à-vis possession of leased property?

The question remains whether the defendant provided "subsequent new value" to the Debtor, and if so, to what extent.

As noted, courts employ different frameworks to evaluate a new value defense in the context of continued retention and use of leased property or services. Here, in the context of Vitel's business which relied on the Fleet leased from Merchants to provide employees with vehicles to reach customer locations to service and install cable systems, it is easy to conclude the continued possession, use, and opportunity to use the Fleet as a whole provided by Merchants during the Preference Period was valuable.

As to the use of any particular vehicle in the Fleet, the parties disagree, and the record is murky. Although the defendant supplied evidence in the form of toll booth records indicating a small number of the leased vehicles passed through toll booths, there is no evidence – one way or the other – about whether the Debtor used the majority of the Fleet vehicles after the preference payments were made. Regardless of actual use, it is undisputed the Debtor retained possession of the vehicles after the payments were made, thus providing the Debtor opportunity to use the Fleet and market itself as a going

concern.  The Debtor's main source of income during the Preference Period was the result of the work of employees who used the Fleet to perform various installment and repair contracts.  On the record here, it is easy to conclude Vitel was operating during the Preference Period and using the Fleet.

Applying the consideration analysis, the court concludes the defendant's provision of continued possession of the Fleet to the Debtor would have constituted consideration sufficient to support a contract, and thus, in this context constitutes new value. Consideration in the new value context has "involved putting the collateral to a materially beneficial use."  *In re Jet Fla. Sys., Inc.*, 841 F.2d at 1084 (citing examples of providing a material benefit including: the value of insurance coverage provided after the payment of delinquent premiums, *In re Dick Henley, Inc.,* 45 B.R. 693, 699 (Bankr.M.D.La.1985); the value of leased equipment when the lessor permitted the debtor-lessee to continue using the equipment to produce inventory after default in rental payments, *In re Quality Plastics*, 41 B.R. at 243; and the value of the electricity supplied by the utility to the debtor after preferential payments*, In re Keydata Corp.*, 37 B.R. 324, 328-29 (Bankr.D.Mass.1983)).

This is not a case of simply forbearing to exercise a legal right, but rather of providing value to Vitel*.  See, In re Maxwell Newspapers, Inc.*, 192 B.R. 633, 637 (Bankr. S.D.N.Y. 1996)(Insurance company "provided something which added value to the estate—insurance coverage. It is not the fact that [the insurance company] refrained from terminating the policy which constitutes the value; it is the fact that [the insurance company] incurred additional risk by continuing coverage. This is not dissimilar from the landlord-tenant context, in which a debtor's occupancy of a premises may be a basis for a finding of new value.").  In *In re Pameco Corp.*, the court found a release of a lien and

the corresponding loss of hypothetical claims against the debtor did not constitute new value because nothing flowed into the estate. *In re Pameco Corp.*, 356 B.R. 327, 339 (Bankr. S.D.N.Y. 2006). Here, new value did flow into the estate providing Vitel with the means and opportunity to continue its business activities.

The Trustee's reliance on *Duffy* is misplaced. *Duffy* involved a chapter 7 individual that had entered into a long-term car lease with Avis. There, the court concluded a forbearance by Avis from repossessing the leased vehicle upon payment of the preferential transfer did not enhance the value of the debtor's estate. The court reasoned that upon the preferential payment, Avis substituted its existing right to repossess immediately with a right to repossess at a future date. *Matter of Duffy*, 3 B.R. at 266. The broad interpretation of *Duffy* urged by the Trustee is unwarranted. Rather, the court finds persuasive the line of cases focusing on whether the creditor *actually* provided new value or augmented the estate rather than whether the creditor did so voluntarily, willingly, or intentionally. *In re Ross*, 97-0063, 1997 WL 331830, at *4 (Bankr. E.D. Pa. June 10, 1997)("Although [the lessee] may not have willingly allowed debtor to occupy the apartment during the period in question, as demonstrated by its initiation of an eviction proceeding, [the lessee's] intention is not relevant to the question of whether the Debtor did in fact receive new value); *In re Lease–A–Fleet, Inc.*, 141 B.R. at 864 ("The important consideration is not whether [the creditor] happily or voluntarily supplied new value to the Debtor, but whether it actually did provide new value to it.").

The facts of *In re Jet Fla. System, Inc.*, are also distinguishable. *In re Jet Fla. System, Inc.*, 841 F.2d at 1084. There, the Eleventh Circuit concluded continued lease of real property that had been vacated by the debtor more than a year prior to the

bankruptcy filing was a drain on the estate, rather than the provision of new value. *In re Jet Fla. System, Inc*., 841 F.2d at 1084. Here, as discussed, the Fleet was actively being used by Vitel during the Preference Period, with evidence including Vitel's employment of more than 150 employees during that time, undisputed use of several vehicles, and the generation of accounts receivable during that time from Vitel's cable installation and repair services. The court concludes Merchants meets its burden to show it conferred a benefit to Vitel.

As discussed already, the policy reasons for the new value defense do not demand the complete use of the provided property, good or service. In *In re Quality Plastics, Inc*., the court found that a debtor's partial use of leased machinery constituted new value. *In re Quality Plastics, Inc*., 41 B.R. 241, 243 (Bankr. W.D. Mich. 1984). Though the trustee in that case argued the debtor's use of the leased machines may have earned less for the estate then their rental price, the court concluded, "the lender should not be saddled with this deficiency and bear the risks of the debtor's operations." *Id*. Similarly, here, the evidence establishes the Debtor chose not only to retain the vehicles, but negotiated to do so and made use of at least some of them supporting a conclusion that to do so was crucial to its business.

Merchants should not bear the burden to itemize how the Debtor made use of each leased vehicle, as the Trustee implies. Adopting the Trustee's argument that new value must be calculated on the actual use of each vehicle leads to unworkable standards. If one vehicle travelled farther on one day but less on another day, was that vehicle less of a benefit on that short trip? Should the court consider the profitability of each job site, each employee, each vehicle, or each day's work? No. Bankruptcy Code § 547's

preference and new value provisions are intended to balance competing goals: encouraging and protecting creditors who continue to do business with distressed business in the hopes of avoiding bankruptcy while also preventing creditors from extracting payments and accelerating a business's slide in bankruptcy.  To conclude Merchants bears a burden to monitor and inspect Vitel's use of each and every leased vehicle to preserve a new value defense in the event of a future bankruptcy filing would be inconsistent with the balance struck in §§ 547(b) and 547(c)(4).  Under the circumstances of this case, the Debtor's partial use of the Fleet is sufficient to constitute new value.

As to the parties' intent and whether they intended an exchange for new value, I am unpersuaded a new value defense should succeed on this basis alone.  *See, contra, In re Payless Cashways, Inc.*, 306 B.R. 243, 248 (B.A.P. 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005).  The record here would support a conclusion the parties did intend the continued use and possession of some or all of the Fleet during the Preference Period to constitute new value.  However, the court does not rely on this factor alone in concluding Merchants established a new value defense pursuant to § 547(c)(4).

### *The Value of the "New Value"*

The parties agree the amount of new value should be calculated on a *per diem* basis.  *See* AP-ECF No. 145, pp. 12-13, 19.  While the Trustee argues the *per diem* amount should be calculated based on the vehicles actually used – placing the burden on Merchants to show individualized vehicle use – the court declines to follow such an approach.  The benefit was Merchant's provision of a Fleet and the accompanying services – it was not the lease of any particular vehicle.

### New Value After the First Transfer of $59,000

Because Merchants' new value defense arises under Bankruptcy Code § 547(c)(4), the provision of new value must arise *after* any preferential transfer. Following the August 3, 2018 transfer of $59,000 and prior to the August 31, 2018 transfer, twenty-seven (27) days elapsed. If the August base charge *per diem* amount of $2,454.93 is multiplied by twenty-seven (27), the new value provided – accounting only for the base charge – totals $66,283.11, providing a complete defense to the August 3, 2018 preferential transfer. Because the base charges alone are sufficient as new value, the court need not calculate what additional new value may have been provided on a *per diem* basis by Merchant's payment of toll charges, title and registration fees and other services provided during this time.

### New Value After the Second Transfer of $25,000

Following the August 31, 2018 transfer of $25,000, thirteen (13) days elapsed before the next transfers on September 14, 2018. Multiplying thirteen (13) by the September base charge *per diem* of $2,536.74, results in a total of $32,977.62. Again, this provision of new value exceeds the preferential transfer.

### New Value After the Third and Fourth Transfers Totaling $50,000

On September 14, 2018, Vitel made two preferential transfers – $11,156.30 and $38,843.70 – to Merchants totaling $50,000. AP-ECF No. 117, p. 3. Vitel did not make another transfer until October 9, 2018. Following the September 14, 2018 transfers, sixteen (16) days elapsed in September and eight (8) days elapsed in October. Multiplying the September base charge *per diem* of $2,536.74 by sixteen (16) and multiplying the October base charge *per diem* of $2,151.90 by eight (8), results in a total

of $57,803.04.   Thus, Merchants' provision of new value following the September 14, 2018 transfers provides complete defense.

### *New Value After the Fifth Transfer of $25,000*

Following the October 9, 2018 transfer of $25,000, nine (9) days elapsed until the Petition Date on October 19, 2018.   If the October base charge *per diem* amount of $2,151.90 is multiplied by those nine (9) days, the new value provided totals $19,367.10, leaving Merchants exposed to $5,632.90 as a preference.   Merchants argues this amount should be reduced even further to deduct for the base charge *per diem* incurred on October 9, 2018 (the day of the preferential transfer) and October 19, 2018 (the Petition Date) totaling $4,303.80, leaving it exposed to at most $1,329.10.   AP-ECF No. 135, p. 11; AP-ECF No. 129-13.   The court declines in this case to award Merchants new value on the day of the preferential transfer.   Merchants – to be entitled to new value – bears the burden of proving the new value was given after the transfer.   Here, there is no evidence of when the preferential transfer was made and so this argument fails.   The court also declines to calculate new value for a portion of the day on October 19, 2018 (the Petition Date) to determine whether any new value was provided before Vitel filed its petition.

In addition to the base charges, Merchants provided Vitel with other services – including advancing toll charges – which could be considered in calculating new value. *In re A-1 Express Delivery Serv., Inc.*, 2020 WL 5883427, at *4 (finding new value when lessee advanced funds for repairs debtor was obligated to cover under lease terms).

For the time period between the October 9, 2018 and October 19, 2018 (the Petition Date), the only evidence of other services provided is the toll report.   AP-ECF No.

129-14. Merchants did not offer or admit into evidence an invoice reflecting other charges incurred for the month of October, 2018. AP-ECF No. 145, p. 16.[10] Adopting in large parts the reasons stated by the Trustee,[11] the court finds the Toll Report unwieldy and unreliable and declines to hunt for *de minimus* amounts of new value that may be found in Merchant's advancement of tolls between October 9, 2018 and October 19, 2018.

## VI.    CONCLUSION

For the reasons set forth above, as to Count One of the Complaint, Merchants shall pay the Trustee $5,632.90 as a preference to which the new value defense does not apply, pursuant to §§ 547(b) and 547(c)(4), and a separate judgment will enter. As to Count Two of the Complaint, a judgment will enter for the plaintiff and against the defendant.

All other arguments made have been considered and determined to be without merit.

This Memorandum of Decision and the separate judgment constitute a final order subject to rights of appeal. The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket. *See,* Fed.R.Bankr.P. 8001*, et seq.,* Fed.R.Bankr.P. 8002(a)(1); *Ritzen Grp., Inc. v. Jackson Masonry, LLC,* 140 S.Ct. 582 (2020); *see,* Fed.R.Bankr.P. 7008, 7012(b).

Dated this 31st day of March, 2023, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut

---

[10]    Court:  So am I correct, Attorney Chapin, that you are not relying on the, the invoice that would have been issued in October in advance for November to support any of your new value argument?
        Attorney Chapin: Unfortunately, your Honor, we didn't put that into evidence. So I kind of kicked myself in hindsight when we were doing the post-trial briefs.  The parts that were billed in arrears would have taken care of it, but we didn't put it in evidence.
AP-ECF No. 145, p. 16, L. 2-10.
[11]    See, AP-ECF No. 134, p. 16.